1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

8
9
10
11
12
13

| BRANCH BANKING AND TRUST COMPANY, | ) | |
|---|---|---|
| Plaintiff, | ) ) | Case No. 2:12-cv-00452-JCM-GWF |
| vs. | ) ) | **FINDINGS AND** |
| | ) | **RECOMMENDATION** |
| JONES/WINDMILL, LLC, *et al.*, | ) ) | |
| Defendants. | ) ) | |

14      This action involves a claim for a deficiency judgment against Defendants arising from the

15 non-judicial foreclosure of a deed of trust on real property.  This matter has been referred to the

16 undersigned magistrate judge to conduct an evidentiary hearing and provide a report and

17 recommendation regarding the fair market value of the subject property at the time of the trustee's

18 sale.  The Court conducted an evidentiary hearing on December 1, 2015.

19                                  **BACKGROUND**

20      The borrower executed and delivered a promissory note secured by a deed of trust on the

21 subject property on January 8, 2006 in the amount of $1,100,000.00.  After the borrower defaulted

22 on the promissory note, the lender commenced non-judicial foreclosure proceedings.  A Notice of

23 Trustee's Sale was recorded on December 22, 2011 and the property was sold at a trustee's sale on

24 February 29, 2012 for a credit bid of $296,000.00.  *Complaint (#1), Exhibit 10, Trustee's Deed*

25 *Upon Sale.*  The total indebtedness at the time of the sale was allegedly $1,128,641.98.  *Complaint,*

26 *pg. 6*, ¶ 30.

27      Plaintiff's appraiser, Glenn Anderson, issued an appraisal report for the subject property on

28 December 7, 2012.  *Plaintiff's Hearing Exhibit 3*.  Mr. Anderson appraised the fair market value of

1  the property at $370,000.00 as of February 29, 2012.[1]  Defendants' appraiser, Charles E. Jack, IV,

2  issued an appraisal report for the subject property on January 15, 2013.  *Defendants' Hearing*

3  *Exhibit 520.*  Mr. Jack appraised the fair market value of the property at $489,000.00 as of February

4  29, 2012.  Mr. Anderson and Mr. Jack are both experienced and competent residential and

5  commercial real estate appraisers, and the parties stipulated to the admission of their respective

6  appraisal reports.  Mr. Anderson and Mr. Jack were the only witnesses to testify at the evidentiary

7  hearing.

8  **A.   Report and Testimony of Appraiser Glenn Anderson.**

9  Glenn Anderson testified that the subject property consisted of 2.12 acres of vacant land

10  located on the west side of Jones Boulevard and north of Windmill Street in Las Vegas, Clark

11  County, Nevada.  The property is located in the southwest quarter of the Las Vegas Valley.  As of

12  February 29, 2012, the property was surrounded by residential development–apartments on the west

13  and north side and single family residential units on the south side.  There were no sidewalks and

14  curbs on the Jones Boulevard side of the property.  The property was zoned for Residential Urban

15  Development (RUD), which allows up to fourteen (14) residential units per acre.  It was master

16  planned for up to eighteen (18) units per acre.  *Transcript of Proceedings (#162) ("TR"), 11:13-25;*

17  *12:1-6.*

18  Mr. Anderson testified that the economic environment for the sale of undeveloped land in

19  Las Vegas in February 2012 was poor.  There was a "very limited market for raw land at the time"

20  and during "the deepest part of the recession, . . . it was difficult to give land away."  "And so it

21  was - - it's still bouncing along the bottom, I think is the best way to describe it, through the mid-

22  part to latter part of 2012."  *TR 14:1-7.*  Mr. Anderson noted that the seriousness of the economic

23  decline was recognized in 2007-2008.  *TR 14:8-18.*  The value of undeveloped land in the Las

24  Vegas area continued to decline into 2012.  Beginning in early to mid-2013, however, there was an

25  "up-tick" or "spike" in real property values in Las Vegas.  There were a lot more transactions and

---

[1] Mr. Anderson also appraised the property on December 16, 2011, at which time he also estimated its fair market value as $370,000.00.  *Defendant's Hearing Exhibit 519.*  Plaintiff listed $370,000.00 as the estimated fair market value for the property in its complaint.  *Complaint (#1), pg. 6,* ¶ 31.

1    prices started to increase. *TR 15:2-13*. Mr. Anderson testified that the value of land suitable for

2    apartment construction is continuing to increase, although the value of residential land, generally,

3    has plateaued. *TR 15:14-18*.

4         Mr. Anderson noted that there are three generally accepted methods for appraising real

5    property: (1) the cost method; (2) the income method; and (3) the comparable sales method.

6    Because the subject property was unimproved vacant land, the comparable sales method was the

7    only appropriate one for determining the subject property's fair market value. *TR 12:15 to 13:12*.

8    To determine fair market value, Mr. Anderson considered the "highest and best use" of the property

9    based on what is (1) legally permissible, (2) physically possible, (3) economically feasible, and (4) a

10   likely use. He concluded that the highest and best use of the subject property was multifamily

11   residential, i.e. apartment development. *TR 16:1 to 17:2*. Mr. Anderson noted that in February

12   2012 the occupancy rate for apartments was stagnant, around 90 percent. He therefore believed that

13   a purchaser would hold the property for some period of time until demand warranted construction.

14   *TR 17:3-23*.

15        Mr. Anderson used the federal Financial Institution Reform and Recovery Act's (FIRREA)

16   definition of fair market value which is set forth in his appraisal report as follows:

17           The most probable price which a property should bring in a
     competitive and open market under all conditions requisite to a fair

18           sale, the buyer and seller each acting prudently and knowledgeably,
     and assuming the price is not affected by undue stimulus. Implicit in

19           this definition is the consummation of a sale as of a specified date and
     the passing of title from seller to buyer under conditions whereby:

20
             *     Both buyer and seller are typically motivated;
21

22           *     Both parties are well informed or well advised, and acting in what
                     they consider to be their own best interests;

23           *     A reasonable time is allowed for exposure in the open market;

24           *     Payment is made in terms of cash in U.S. dollars or in terms of
                     financial arrangements comparable thereto; and
25

26           *     The price represents the normal consideration for the property sold
                     unaffected by special or creative financing or sales concessions
                     granted by anyone associated with the sale.
27

28        *Plaintiff's Hearing Exhibit 3, pg. 8.*

1    Mr. Anderson testified that this definition is conceptually the same as the Nevada Supreme

2    Court's definition of fair market value in *Unruh v. Streight.  TR 20:8-13.*

3    Mr. Anderson looked for comparable sales of undeveloped real property that were suitable

4    for multifamily development as close in time to the trustee's sale date as possible.  He was willing

5    to consider sales that occurred 12 or 18 months before the sale date.  *TR 21:13 to 22:1.*  He did not

6    consider sales that occurred after the trustee's sale date, however.  Although an appraiser is not

7    precluded from considering subsequent comparable sales, Mr. Anderson believes it is unfair to do so

8    because prospective buyers or other market participants would not have known of such sales.  "And

9    so I would try and maintain a cut-off date of the valuation date."  *TR 22:4-14.*  He stated, however,

10   that he would be willing to consider comparable sales that closed after the date of the trustee's sale

11   if they had been entered into before that date and information regarding the sales was available to

12   potential buyers or market participants.  *TR 23:3-11.*

13   Mr. Anderson testified that besides properties that were suitable for multifamily

14   development, his other criteria included location, size, condition of the property, and off-site

15   improvements.  *TR 24:1-4.*  He also considered sales by banks and lending institutions that had

16   reacquired the properties through trustee's sales.  These types of sales are referred to as "REO

17   sales."  *TR 24:16 to 26:6.*  Mr. Anderson stated that "in this particular case, it was very difficult to

18   avoid [REO sales] because those made up a substantial portion of the market at that point in time. . .

19   . [T]he land that was being sold or the properties that were being sold, a high percentage of them

20   were being sold by banks or just REO-type transactions."  *TR 25:11-18.*  Mr. Anderson testified that

21   REO sales affected other sales as follows:  "Well, . . . it sort of leveled the playing field. . . . [I]f the

22   vast majority of the market is REO sales, and if you are interested in selling your property at that

23   point in time, that's your competition."  *TR 25:21-14.*  Under cross-examination, Mr. Anderson

24   testified that he would not discount an REO sale on the assumption that it was made under duress or

25   stress.  He stated that some banks hold properties for extended periods until they can stabilize and

26   manage them to compete with the sales of other properties.  *TR 50:2-11.*  He also rejected the

27   assertion that REO sales are, on average, lower than other "arms length sales."  *TR 50:22 to 51:4.*

28   Mr. Anderson estimated that during the 2011-2012 period, REO sales accounted for approximately

4

50 percent of real property sales in Las Vegas.  He did not, however, make any calculation of the percentage of REO sales to other sales during that time period.  *TR 51:9 to 52:8.*

Mr. Anderson identified six comparable sales of undeveloped land in the Las Vegas Valley for purposes of his appraisal.  These sales occurred between April 2011 and February 2012, and are summarized in his report as follows:

1. Northwest corner of Commerce and Gowan Road, Sale Date: 2/2012, Sale Price: $750,000, Size Sq.Ft. 394,654, Price Sq.Ft. $1.90;

2. North side of Sunset Road west of Durango Drive, Sale Date: 11/2011, Sale Price: $1,700,000, Size Sq.Ft. 420,790, Price Sq.Ft. $4.04;

3. South side of American Pacific Drive east of Arroyo Grande Boulevard, Sale Date: 8/2011, Sale Price: $1,475,000, Size Sq.Ft. 311,890, Price Sq.Ft. $4.73;

4. South side of Ann Road, west of Camino Al Norte, Sale Date: 7/2011,  Sale Price: $2,360,000, Size Sq.Ft. 822,413, Price Sq.Ft. $2.87;

5. Northwest corner of North 5th Street and Rome Boulevard alignment, Sale Date: 6/2011, Sale Price: $2,500,000, Size Sq.Ft. 789,307, Price Sq.Ft. $3.17;

6. Surrounding the Northwest corner of South Maryland Parkway and Silverado Ranch Boulevard, Sale Date: 4/2011, Sale Price: $1,415,000, Size Sq.Ft. 284,743, Price Sq.Ft. $4.96.

*Plaintiff's Hearing Exhibit 3, pg. 65.*

Sale Nos. 1, 4 and 5 were for properties located in North Las Vegas which generally is a lower price submarket than the submarket in which the subject property is located.  Mr. Anderson testified that he included the three North Las Vegas sales as comparables because the properties were suitable for multifamily development.  *TR 43:19 to 44:2.*  Sale No. 3 was for a property located in Henderson, Nevada in the southeast quarter of the Las Vegas Valley.  Sale No. 6 was for property located in the southeast quarter of the Las Vegas, Nevada, but somewhat closer to the subject property.  Only Sale No. 2 was for property located in the southwest quarter of the Las Vegas Valley in relatively close proximity to the subject property.  *See Plaintiff's Exhibit 3, pg. 66*, location map.  Sale Nos. 1, 2, and 6 were REO sales.  *Id., pgs. 67, 69, and 78.*

Mr. Anderson stated that the property in Sale No. 1 which occurred during the same month as the trustee's sale of the subject property, was located in an older industrial area in the north submarket (North Las Vegas) which generally commands a lower sales price per unit and lower

1   rents than properties in the submarket where the subject property was located.  The physical

2   condition of the property was also inferior to the subject property.  The subject property was smaller

3   than the Sale No.1 property.  Smaller parcels tend to sell for higher prices.  The Sale No. 1 property

4   was superior, however, with respect to offsite improvements.  Mr. Anderson stated that "[o]verall,

5   the unit price paid per square foot [$1.90] is considered to be below what the subject could

6   command."  *Plaintiff's Exhibit 3, pg. 80* (bracketed information added).  The property in Sale No. 2

7   was near a freeway interchange and was therefore superior in location to the subject property.  It

8   also had offsite improvements, but was a larger parcel than the subject property.  Mr. Anderson

9   stated that the square foot price paid for the Sale No. 2 property, $4.04, was above what the subject

10  property could command.  *Id., pg. 81.*  The property in Sale No. 3 was also superior to the subject

11  property based on its offsite improvements, but was also subject to downgrade based on its larger

12  parcel size.  Mr. Anderson stated that the square foot price paid for this property, $4.73, was

13  "considered to be similar to what the subject could command."  *Id., pgs. 81-82.*

14       Mr. Anderson stated that the property in Sale No. 4 was inferior to the subject property

15  based on its north submarket location, but was superior with respect to its offsite improvements.

16  This property was also downgraded based on its larger size.  Mr. Anderson stated that the square

17  foot price for the property in Sale No. 4, $2.87, was below what the subject property could

18  command.  *Id., pg. 82.*  The property in Sale No. 5 was also in the north submarket, had an inferior

19  location and was subject to downgrade based on its larger parcel size.  Mr. Anderson stated that

20  square foot price for the Sale No. 5 property, $3.17, was below what the subject property could

21  command.  *Id., pg. 83.*  The property in Sale No. 6 had superior offsite improvements, but was

22  subject to downgrade based on its larger parcel size.  Mr. Anderson stated that the square foot price

23  for the Sale No. 6 property, $4.96, was above what the subject property could command.  *Id., pg. 84.*

24       Mr. Anderson concluded that "[g]iven the differences between the subject and the

25  comparables for size and location, none of the comparables are considered to be more similar to the

26  subject than another and equal consideration has been given to all of the sales."  He concluded that

27  the *as is* value of the subject property was $4.00 per square foot, which multiplied by its 92,347

28  square feet, resulted in a value of $370,000.00.  *Id., pg. 84.*

On cross-examination, Mr. Anderson again acknowledged that property values began to increase in early to mid-2013 and that the increase may have begun at the end of 2012. *TR 35:1-15.* He did not attempt to quantify the overall percentage increase in the value of real property between 2012 and 2013. *TR 33:22-25.* Mr. Anderson was shown documents relating to the sale of the subject property in May 2013 for $550,000.00. *TR 39:14 to 40:4.* He testified that the difference between his estimated value of $370,000 in February 2012 and the actual sale of the property in May 2013 was 48.65 percent. *TR 40:23 to 41:1.* In response to whether this percentage of increase was typical for the period from 2012 to 2013, Mr. Anderson testified that there was a resurgence in demand for housing in 2013 and he was not surprised by the increase in value of the property from February 2012 to May 2013. This information did not cause him to question the validity of his opinion regarding the fair market value of the property in February 2012. *TR 41:4-23.*

On redirect examination, Mr. Anderson was provided with documents showing that Plaintiff sold the subject property in December 2012 for $335,000.00. *TR 56:7-25.* Mr. Anderson testified that this sale indicated that the market was probably still moving along at the bottom in late 2012. *TR 57:6-8.* He also testified that the current owner of the property had assembled the subject property with another parcel in the area for a residential development. *TR 59:14 to 60:25.* This type of purchase by an end-user who has plans to develop the property generally results in a higher sales price than a sale to a speculator who purchases the property for resale. *TR 61:2-14.*

Mr. Anderson stated that as of December 7, 2012, he had appraised approximately five properties for deficiency judgment purposes. By the time of his testimony, the number was approximately ten. He estimated that the split between appraisals done for lenders and borrowers was "70/30 maybe." *TR 37:12 to 38:4.*

### B.   Report and Testimony of Appraiser Charles Jack, IV.

Defendants' Appraiser, Charles Jack, IV, testified that he also used the comparable sales approach to determine the fair market value of the subject property as of the date of the trustee's sale on February 29, 2012. *TR 71:7-10.* In determining the highest and best use of the subject property, Mr. Jack spoke with the Defendants who advised him that they were considering using the property for an autism center. *TR 72:1-7.* The Defendants provided him with a site plan for the property

7

1   which was titled the "Willow Creek Autism Center for Children." *TR 72:22 to 73:2.* Mr. Jack

2   testified that based on his other appraisal activity, he noticed that "institutional land uses, religious

3   land uses, like a hospice or a - - this autism center, or a memory care, Alzheimer's care . . . were

4   actually getting more active, because I believe the price level of land had come down now to where

5   those market participants were comfortable conducting transactions. So we were finding

6   transactions with those types of land users." *TR 73:13-21.* Mr. Jack concluded that the highest and

7   best use of the subject property would be to "hold it for a potential future medium to high density

8   multifamily development," or, in the alternative, for uses that include a church or house of worship,

9   charter or religious school, hospice, assisted living center, or other similar specialized uses. *TR*

10  *74:7-15. See also Defendants' Exhibit 520, Mr. Jack's Appraisal Report, pgs. 140-141.*

11         Mr. Jack identified five comparable sales of property which are summarized in his report as

12  follows:

13         1.   Blue Diamond between Grand Canyon and Chieftain LV, NV, Sale
             Date:11/30/2012, Sale Price: $300,000, Size Sq.Ft. 53,579, Price Sq.Ft.
14           $5.60.

15         2.   NEC Durango & Badura, LV, NV, Sale Date: 6/12/2012, Sale Price:
             $2,600,000, Size Sq.Ft. 435,600, Price Sq.Ft. $5.97.
16
           3.   E of SEC Decatur & Post, LV, NV, Sale Date: 3/19/2012, Sale Price:
17           $600,000, Size Sq.Ft. 113,256, Price Sq.Ft. $5.30.

18         4.   SEC Tenaya & Post, LV, NV, Sale Date: 4/28/2011, Sale Price: $765,000, Size
             Sq.Ft. 191,664, Price Sq.Ft. $3.99.
19
           5.   SEC Jones & Post, LV, NV, Sale Date: 1/4/2011, Sale Price: $550,000, Size
20           Sq.Ft. 85,813, Price Sq.Ft. $6.41.

21         *Defendants' Exhibit 520, pg. 145.*[2]

22         The comparable sales selected by Mr. Jack involved properties that were generally located in

23  the southwest quarter of the Las Vegas Valley. *See Defendants' Exhibit 520, pg. 143; TR 78:21 to*

24  *79:1.* Mr. Jack testified that there is a southwest submarket for the type of property involved in this

25  appraisal. *TR 79:3-22.*

26

27
           [2] Mr. Jack's Sales Chart provides additional categories relating to the comparables. The Court has
28  modified its summary of his chart to reference the same categories in Mr. Anderson's report.

Mr. Jack noted in his report that the property in Sale No. 1 ("Sale 1") occurred approximately 9 months after the trustee's sale of the subject property.  In his comparison of Sale 1 to the subject property, Mr. Jack stated the locational comparisons of the two properties were similar.  Sale1 was less likely to be developed within the same time frame as the subject property. The Mixed Use Overlay (MUD-3) for Sale 1, however, provided some density and use potential in the future that the subject property did not have.  He noted that during the peak period of property values, the MUD-3 overlay was a significant contributor to land value.  He found that the MUD-3 overlay for Sale 1 required some mild to moderate downward adjustment in comparison to the subject property.  Mr. Jack considered, but did not apply a downward adjustment based on the assemblage possibilities for the Sale 1 property over that for the subject property.  Mr. Jack further stated:

> Finally, I considered an adjustment for market conditions. Information provided earlier and in the workfile had indicated that property prices for residential development have peaked up a bit since the beginning of 2012.  However, most of those increases have been witnessed for the lower to medium density single family land and not for multi-family.  However, Sales 1 and 2 which transacted slightly after the effective date of the appraisal appear to indicate some mild upward movement in the range of about 5-10% when comparing the later Sales 1 and 2 to Sale 3 which recorded right around the effective date of this appraisal report.  I have applied a downward adjustment of 5% for market conditions to Sales 1 and 2 to reflect the observation that prices may have increased slightly due to slightly better supply/demand market conditions and sales figures being reflected in the market during the course of 2012.

*Defendants' Exhibit 520, pgs. 152-153.*

Mr. Jack stated that "after considering the mild to moderate downward adjustments for size, use potential/overlay/zoning, and market conditions," a unit price moderately below the $5.60 per square foot price for Sale 1 was indicated.  *Defendants' Exhibit 520, pg. 153.*

Mr. Jack stated that the location of the property in Sale 2 was considered to be superior to the subject property because it was near a freeway interchange.  The manner in which the sale was financed, however, indicated that the sale price was higher than what it would have been if typical terms had been used.  *Id., pg. 153.*  Although the sale was an REO sale, which would typically require some upward adjustment, the financing of the sale negated this as a factor.  After applying

the downward and upward adjustments, Mr. Jack concluded that the fair market value of the the

subject property was moderately below the $5.97 per square foot price for Sale 2. *Id., pgs. 153-154.*

Mr. Jack reported that the property in Sale 3, which occurred on March 19, 2012 and sold for

$5.30 a square foot, was purchased by a buyer who had an interest in the property because it owned

adjacent footage on South Decatur Blvd.  The seller, however, did not believe the property

commanded a premium for assemblage.  The seller reported that another buyer was looking for

similar property in the area and could not find a willing seller at the price for which Sale 3 sold.  Mr.

Jack determined that the zoning/potential use of the property was similar to the subject property.  He

summarized his comparison between Sale 3 and the subject property as follows:

> Overall, there is an applied downward adjustment for location.  There
> is an upward adjustment for the gross parcel size condition compared
> to the subject's net.  There is no adjustment for size differential.
> There is an adjustment downward for the adjoining parcel owner
> influence.  I believe that the lack of direct frontage (requiring an
> upward adjustment for this inferior attribute compared to the subject)
> approximately offsets the upward influences on the value for the
> remaining adjustment for adjoining parcel owner's more intense
> motivation to purchase/acquire the property (requiring a downward
> adjustment for this higher than normal motivation/conditions of sale).
> In my opinion, this best explains the remaining comparison where
> there is a slight increase in unit price moving forward in 2012.
>
> I expect a price at a level near that of Sale 3 at $5.30 per square foot
> or $230,769.23 per acre to apply to the subject property.

*Defendants' Exhibit 520, pgs. 155-156.*

Mr. Jack reported that the property in Sale 4 was sold to a church for a per square foot price

of $3.99, and was purchased from an REO portfolio.  The property had an inferior location because

it was not on a trafficked arterial street such as the subject property or the other comparables

identified in his report.  Mr. Jack stated that the largest consideration in evaluating Sale 4 in

comparison to the subject property was that it was an REO sale.[3]  Mr. Jack provided a fairly detailed

analysis of REO sales in his report.  He discussed three properties which were initially sold in REO

sales and then resold shortly thereafter in traditional sales at significantly higher prices.  These sales

---

[3] Mr. Jack used the acronym "OREO."  However, OREO and REO mean the same thing.  For
consistency and clarity the Court uses "REO" in referring to such sales.

10

and resales occurred in 2009 and 2010.  Two of the sales involved residential use properties and the third was a commercial use property.  *Id., pgs. 157-158.*  Mr. Jack stated that the price differential between REO and traditional sales of the same property appeared to be greater for commercial than for residential property.  He also stated that "[a]s time has elapsed since 2009 and 2010 market sellers have become more realistic and have recognized that if they wish to sell they will have to compete with other listings of an REO nature or other compelled or obligated circumstances offerings (short sales, bankruptcy sales, etc.)  This has narrowed the gap between traditional sales from solvent sellers and sales that one may see from an REO portfolio as time has progressed.  However, I still typically see some gap amongst the sales and brokers/buyers/sellers often report a pricing differential between REO sales and other traditional sold parcels that do not involve bank ownership and sale."  *Id., pg. 158.*

Mr. Jack opined that "a 25% premium for the subject type of land and the retrospective market conditions in existence as of February 29, 2012 would be a necessary premium to apply to an REO sale in comparison to a solvent traditional sale that would meet the 'Fair Market Value' definition of Unruh v. Streight utilized herein.  Higher premiums are possible but application of significantly higher premiums in the neighborhood would bring the adjusted price of Sale 4 outside the range of the other comparables and suggests an adjustment beyond this level would not be likely."  *Id., pg. 159.*  Mr. Jack concluded that a materially higher price than the $3.99 per square foot in Sale 4 was applicable to the subject property under the governing definition of fair market value.  *Id.*

Sale 5 involved the sale of property on January 4, 2011 which was thereafter developed as a hospice care facility with an appurtenant office building supporting the hospice function.  Mr. Jack found this use to be similarly attractive and competitive to the use of the subject property as an autism center.  The location of the property was superior to the subject property and had competitively similar zoning.  The chief factor resulting in a downward adjustment was that the sale of the property occurred more than a year before the trustee's sale date for the subject property.  Mr. Jack stated that there were decreasing market conditions from January 2011 to February 2012.  He therefore "expect[ed] a unit price materially lower than the $6.41 per square foot or $279,188 per

1   acre indicated by Sale 5 as a result of my comparisons above." *Id., pg. 160.*

2          In summarizing his analysis of the comparable sales data, Mr. Jack again emphasized the

3   importance of recognizing that REO sales tend to result in lower sale prices due to "obliged"

4   conditions of sale that do not exist in a traditional sale.  He stated that REO sales are not consistent

5   with the definition of fair market value for purposes of a deficiency judgment action as set forth in

6   *Unruh v. Streight*.  Mr. Jack also contrasted that definition of fair market value with the accepted

7   definitions of "disposition value," in which the seller is under compulsion to sale, and "liquidation

8   value," in which the seller is under extreme compulsion to sale.  *Id. pgs. 161-163.*  Mr. Jack

9   concluded that the fair market value for the subject property as of February 29, 2012 was $5.30 per

10  square foot, which results in a total fair market value of $489,440.00 or $489,000.00 if rounded to

11  the nearest $1,000.00.  *Id., pg. 164.*

12         During his hearing testimony, Mr. Jack disagreed with Mr. Anderson's opinion that it is

13  unfair to use subsequent comparable sales to estimate the fair market value of a property.  He stated

14  that if the appraiser makes an appropriate adjustment for market conditions, then consideration of

15  subsequent sales is appropriate.  *TR 76:6-20.*  Mr. Jack also testified: "My understanding is there's a

16  case that speaks to appraisers, *Elko Zillich*, that suggests that comparable sales after the effective

17  date of the report are not to be abandoned or dismissed.  They can be considered and go towards the

18  weight of the evidence."  *TR 76:22-25; 77:1-2.*  He further stated that there is nothing in the

19  standards that suggests an appraiser cannot use subsequent sales as comparisons so long as they are

20  properly considered and adjusted.  *TR 77:3-5.*

21         Mr. Jack also reiterated the importance of looking for non-REO sales for purposes of

22  comparison with a sale under the fair market value standard used in deficiency actions.  If REO

23  sales are used for comparison, the type of adjustment he described in his report should be used.  *TR*

24  *83:25 to 85:1.*  He testified that he has observed similar types of adjustments made in reports

25  prepared by other appraisers.  *TR 85:19-24.*  Mr. Jack stated that although Sale 4 was an REO sale,

26  he included it as a comparable sale because it was purchased as a church and was consistent with the

27  alternative highest and best use he identified for the subject property.  *TR 86:1-10.*  Mr. Jack

28  appeared to generally agree with Mr. Anderson's description of market conditions in 2012.  He

1    testified, however, that he believes that residential property began to increase in value during 2012.

2    *TR 87:3-19.*

3          Defendants' counsel asked Mr. Jack what inferences or conclusions he draws from the

4    $550,000.00 sale of the subject property in May 2013.  Mr. Jack indicated that the May 2013 sales

5    price was 12.47 percent more than his $489,000.00 estimate of the property's fair market value as of

6    February 29, 2012.  He stated that this increase was consistent with the improvement in residential

7    real estate market from 2012 to 2013.  *TR 90:19 to 91:15.*  Defendants' counsel also asked Mr. Jack

8    about Plaintiff's sale of the subject property for $335,000 in December 2012 in comparison to its

9    subsequent sale in May 2013 for $550,000.  Mr. Jack stated that "all I can say is I don't recall

10   making 64 percent adjustments on land of that type in 2012."  *TR 92:20-21.*  He indicated that such

11   substantial increases in property values did occur, however, by the later part of 2013.  *TR 92:22-24.*

12         Mr. Jack acknowledged on cross-examination that he appraised the subject property for the

13   Plaintiff on June 30, 2010 at $350,000.00.  *TR 94:20 to 96:4.*  In his 2010 appraisal, Mr. Jack

14   considered three REO sales, one estate sale, and a traditional sale as comparables.  *TR 99:6-12.*  He

15   did not make any adjustment of the REO sales in that report.  *TR 99:20 to 100:2.*  Plaintiff's counsel

16   quoted Mr. Jack's statement in his 2010 report that REO sales were now commonplace in the

17   market, and that "'solvent sellers now must compete with REO and/or estate sale prices or they will

18   not close escrow in these market conditions.  As a result such sales are not considered under duress

19   given current market conditions and the definitions detailed above.'"  *TR 100:15-23.*  Plaintiff's

20   counsel asked Mr. Jack if that was essentially the same opinion that Mr. Anderson rendered during

21   his hearing testimony.  Mr. Jack disagreed, stating that Mr. Anderson's opinion was based on the

22   FIRREA market value definition which he, Mr. Jack, considers to be a completely separate

23   definition of fair market value.  *TR 101:12-21.*  Mr. Jack further stated that he made adjustments for

24   REO sales in his December 2013 appraisal report "[b]ecause I found more solvent, arm's length

25   traditional sales in 2012 than I did in 2010 when the market was much more distressed."  *TR 102:5-*

26   *7.*  Mr. Jack also testified that "REO sales were more prevalent in 2010 or almost completely

27   dominating the market.  They weren't in 2012."  *TR 117:24-25.*

28   . . .

13

1    Plaintiff's counsel then asked: "So you are saying that the market had improved between

2    2010 and 2012?" Mr. Jack responded: "Yes." *TR 102:8-10.* Plaintiff's counsel then had Mr. Jack

3    compare statements in his two appraisal reports for the subject property which showed that the

4    vacancy and rental rates for retail, office and industrial space were worse in the last quarter of 2011

5    than they were in the first quarter of 2010. *TR 103:8 to 105:10.* Mr. Jack testified, however, that

6    these statistics did not apply to the evaluation of the fair market value of vacant land for residential

7    uses. *TR 105:16 to 106:25.* Plaintiff's counsel also called Mr. Jack's attention to the statement in

8    his December 2013 appraisal report with respect to Sale 5 that a downward adjustment was

9    warranted "for decreasing market conditions through January of 2011 to February of 2012." *TR*

10   *122:15-23.* Plaintiff's counsel also pointed to a statement in Mr. Jack's June 2010 report that

11   "'[a]ccording to many experienced Las Vegas real estate professionals, Las Vegas real estate has not

12   yet hit bottom in all economic categories[.]'" *TR 107:7-9.* Plaintiff's counsel challenged Mr. Jack's

13   later appraisal of the subject property in light of that statement. Mr. Jack responded by stating that

14   "I think you're mistaking the difference between market conditions and conditions of sale. I've

15   always looked at the improvement in - - and especially the improvement in home prices in 2013 and

16   2014 and up through the present day, a large part of it is due to the declining number of short sales

17   and foreclosures. As - - as those numbers declined, the prices went up." *TR 107:20 to 108:1.* Mr.

18   Jack further stated: "And my understanding is for a deficiency action, we are supposed to reflect the

19   market conditions decline, but we do not reflect a liquidation, a disposition forced sale price. And

20   that's what I attempt to do in all of my deficiency action appraisals." *TR 108:7-11.*

21   On re-direct examination, Mr. Jack testified that his 2010 appraisal was not made for the

22   purposes of a deficiency action governed by the fair market value definition in *Unruh v. Streight*.

23   *TR 124:1 to 127:1.* In his 2010 report, after quoting *Unruh's* definition of fair market value, Mr.

24   Jack discussed the distinction between sales made "undue duress" and "obliged" sales. *Plaintiff's*

25   *Exhibit 7, pgs. 699-701.* Although Mr. Jack stated that it was proper to consider "obliged" sales in

26   his appraisal, he also stated:

27                   The above discussion is the rationale behind the explanation and
                     support for the warning by this appraiser that this appraisal is not
28

14

> being conducted for the purpose of conducting an appraisal involving a deficiency judgement action.  If an appraisal is required for deficiency judgment purposes, the appraiser would recommend a new assignment be ordered at the request of an attorney retained by the Client.  If Nevada law controls, the market value definition and the effective date of value and possibly other elements of the appraisal would be different than that reported herein.

*Plaintiff's Exhibit 7, pg. 701.*

On redirect examination, Mr. Jack also read the following portion of his 2010 appraisal report into the record:

> "The only signs of recovery, at the present time locally, is that the rates of decline are declining or leveling off.  Median home prices appear to have stabilized, and the transaction activity in the built housing market appears quite healthy, as solvent purchasers and investors are buying product at significantly reduced prices in comparison to that paid three to six years ago."

*TR 128:8-14; See also Plaintiff's Exhibit 7, pg. 703.*

Mr. Jack also testified that there was a decline in residential foreclosures in October 2011 resulting from the enactment of AB 284 and this resulted in some improvement in the residential property market.  *TR 128:23 to 130:10.*

## **DISCUSSION**

In a deficiency action, the court is required to conduct a hearing and consider all relevant evidence in determining the fair market value of the property at the time of the trustee's sale.  NRS 40.457(1); *Branch Banking & Trust v. Pebble Creek Plaza, LLC*, 46 F.Supp.3d 1061, 1076 (D.Nev. 2014).  For purposes of a deficiency action, "[f]air market value is generally defined as the price which a purchaser, willing but not obligated to buy, would pay an owner willing but not obligated to sell, taking into consideration all the uses to which the property is adapted and might in reason be applied." *Unruh v. Streight*, 96 Nev. 684, 686, 615 P.2d 247, 249 (1980).  The court may consider all relevant evidence in determining the value of the property. *Id.*, citing *Tahoe Highlander v. Westside Fed. Sav.*, 95 Nev. 8, 588 P.2d 1022 (1979).

In *City of Elko v. Zillich*, 100 Nev. 366, 379, 683 P.2d 5, 8 (1984), an eminent domain action, the court applied a definition of fair market value similar to that applied in *Unruh*.  The city argued on appeal that it was an error to admit evidence of comparable sales made after the valuation

15

date for the condemned property.  In holding that the district court did not err, the Nevada Supreme

Court stated:

> Although it is true that in most cases "the best evidence [of market value of real property in condemnation] is found in sales of comparable property within a reasonable time before the taking," the trial court is allowed wide discretion in passing on matters relating to expert testimony in these cases.  *United States v. 25.02 Acres of Land, Douglas County Colo.*, 495 F.2d 1398, 1400-1401 (10th Cir. 1974). We find no abuse of discretion in this instance.  The trial court properly determined that the differences in time between the date of summons and the dates of comparable sales affected the weight of the evidence and not its admissibility.  *See Clark Co. School District v. Mueller*, 76 Nev. 11, 19, 348 P.2d 164, 168 (1960).

*Zillich*, 100 Nev. at 369-370, 683 P.2d at 7.

*Zillich* is no ringing endorsement for the consideration of sales made after the date of the

trustee's sale of real property.  Mr. Anderson's testimony that subsequent sales should not be

considered because such information would not have been available to potential buyers and sellers

at the time of the trustee's sale makes sense.  On the other hand, Mr. Jack's testimony that a sale of

similar property within a reasonable time after the date of the trustee's sale may be more probative

of the property's value than prior sales of dissimilar properties is also reasonable.

It is clear from both appraisers' testimony that the fair market value of the subject property

in early 2012 was significantly lower than its value in 2013.  This is evidenced by the sale of the

subject property in May 2013 for $550,000.00, which translates to more than $5.95 per square foot–

well above Mr. Jack's estimate of $5.30 per square foot for the property in February 2012.  The

evidence demonstrates that a substantial increase in property values occurred in 2013.  It does not

appear, however, that there was a significant change in property values, up or down, during 2012.

Thus, Mr. Jack's consideration of sales that occurred in March, June and late November of 2012

was not per se unreasonable.  Mr. Jack stated that a downward adjustment of 5 to 10 percent for

these later sales was reasonable.  It is not clear why he applied the lower 5 percent downward

adjustment other than that it was more favorable to the Defendant.

The other major area of disagreement between Mr. Anderson and Mr. Jack relates to the

treatment of REO sales.  Both experts considered REO sales as comparables in making their

appraisals.  Mr. Anderson considered three REO sales in his analysis.  Although Mr. Anderson

16

1    adjusted upward or downward for other factors relating to these sales, he did not apply an upward

2    adjustment because of the REO sales.  Mr. Jack considered two REO sales in his analysis.  He

3    opined that an upward adjustment should be made for REO sales when making a fair market value

4    determination under *Unruh v. Streight* because such sales involve some obligation or pressure on

5    the owner-lender to sell.

6          Mr. Jack opined that an upward of adjustment of 25 % should generally be made for REO

7    sales that occurred during the 2011-2012 time period.  The information on which Mr. Jack relied to

8    formulate this percentage involved two sales of residential properties and one sale of commercial

9    property.  This was a small sample upon which to base a general upward adjustment of 25 percent.

10   Mr. Jack also stated that the gap between traditional sales and REO sales had narrowed since 2010

11   as traditional sellers recognized that they had to compete with REO sales.  Mr. Anderson relied on

12   this same factor to conclude that no adjustment for REO sales should be made.  Mr. Jack did not

13   apply an REO upward adjustment to Jack Sale 2 because the financial terms of that sale would have

14   required an approximately equal reduction and therefore negated an upward adjustment.  In the case

15   of Jack Sale 4, however, Mr. Jack applied the 25 percent upward adjustment.

16         Plaintiff's sale of the subject property in December 2012 for $335,000.00 tends to support

17   Mr. Jack's testimony that an upward adjustment should be made for REO sales.  The evidence does

18   not show that the fair market value of the subject property declined significantly during 2012.  Mr.

19   Anderson testified the market generally "bumped along" at the bottom in 2012.  He also

20   acknowledged that there was some indication that values were beginning to rise in late 2012.  Mr.

21   Jack opined that the property values increased somewhat in the latter part of 2012–hence his

22   downward adjustment for the subsequent sales.  Plaintiff nevertheless sold the property for $45,000

23   less than the value that it placed on the property when it filed its complaint in March 2012.  This

24   indicates the type of "obliged" sale that Mr. Jack testified should be adjusted upward in determining

25   fair market value under the *Unruh v. Streight* definition.[4]

26

27         [4] It is also possible that Plaintiff's sale of the property was influenced by the fact that it was pursuing

28   a deficiency judgment against the Defendants.

1    In addition to using three REO sales in his comparison, Mr. Anderson selected three sales

2    from the north submarket (North Las Vegas) where properties generally sell for less.  Only one of

3    his comparables was in the southwest submarket where the subject property is located.  All of his

4    comparable properties were significantly larger than the subject property.  In fact, the smallest

5    comparable property was three times larger than the subject property.  This does not mean that the

6    properties were not proper comparables so long as proper adjustments were made for their

7    differences. The certainty and reliability of Mr. Anderson's appraisal, however, is lessened by these

8    differences and the adjustments that had to be made to account for them.  Mr. Anderson also stated

9    in his report that the $4.73 square foot price of Sale 3 was "considered to be similar to what the

10   subject could command."  Yet he selected a square foot value of $4.00 for the subject property.

11   This was close to the square foot price of Sale 2 which was an REO sale and involved an even larger

12   sized property than Sale 3.

13        Although Mr. Jack selected five comparable sales that were all located in the southeast

14   submarket, three of the sales occurred after the February 29, 2012 trustee's sale.  Jack Sale 2 on

15   March 19, 2012, however, occurred less than a month after the trustee's sale and therefore could

16   have been a comparable sale under Mr. Anderson's more restrictive standard because it was likely

17   agreed to before February 29, 2012.  The Court is not persuaded that Mr. Jack's application of a

18   downward adjustment of only 5 percent for the subsequent sales in June and November 2012 was

19   sufficient.  Likewise, the Court is not convinced that an upward adjustment of 25 percent for REO

20   sales is warranted.  There were also differences between properties in the comparable sales selected

21   by Mr. Jack and the subject property which lessened their reliability as indicators of value.  Jack

22   Sale 1 had more favorable zoning than the subject property and there was an assemblage factor for

23   this sale.  Sale 3 also involved a purchase by the adjacent land owner for which a assemblage

24   premium could have been applied.  Mr. Jack did not apply a downward adjustment, however, based

25   on the statement by the seller that he did not believe assemblage affected the sale price.  Jack Sale 5

26   was made more than a year before the trustee's sale and Mr. Jack acknowledged that there needed to

27   be a substantial downward adjustment based on declining value from January 2011 to February

28   2012.

1

**CONCLUSION**

2        Both appraisers' opinions were influenced in favor of the party who retained them which is

3  not unusual when experts are retained for purposes of litigation.  The opinions of Mr. Anderson and

4  Mr. Jack are subject to reasonable doubt based on the comparable sales they selected and the

5  adjustments they made or did not make in arriving at their valuations.  The reasonable fair market

6  value of the property therefore lies somewhere between each appraiser's opinion.  The Court does

7  not pretend that the value it selects is a precise determination of the fair market value of the property

8  on February 29, 2012.  Rather, it is based on a consideration of the strengths and weaknesses of each

9  expert's analysis and opinion, together with the other evidence in the record.  The Court finds,

10  however, that the balance tips modestly in favor of the opinion of Defendant's expert Mr. Jack who

11  selected properties in the submarket in which the subject property is located, notwithstanding that

12  three of the comparable sales selected by him occurred after the date of the trustee's sales.  Mr. Jack

13  made adjustments for that factor, as well as for the REO sales.  By contrast, all of Mr. Anderson's

14  comparable involved prior sales, but the properties were located in different submarkets, and were

15  substantially greater in size than the subject property.  Mr. Anderson also made no adjustment for

16  REO sales.  The Court therefore concludes that the fair market value of the subject property on

17  February 29, 2012 should be based on a square foot value of $4.75, which multiplied by 92,347

18  square feet equals $438,648.25.  Accordingly,

19

**RECOMMENDATION**

20        **IT IS HEREBY RECOMMENDED** that the Court find that the fair market value of the

21  subject property on the date of the trustee's sale, February 29, 2012, was **$438,648.25.**

22

**NOTICE**

23        Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

24  in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has

25  held that the courts of appeal may determine that an appeal has been waived due to the failure to file

26  objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has

27  also held that (1) failure to file objections within the specified time and (2) failure to properly

28  address and brief the objectionable issues waives the right to appeal the District Court's order and/or

1    appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157

2    (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

3             DATED this 10th day of February, 2016.

4

5                                                         _____

6                                                         **GEORGE FOLEY, JR.**
                                                          **UNITED STATES MAGISTRATE JUDGE**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28